## AFFIDAVIT OF SPECIAL AGENT ERIN FULLER IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, ERIN FULLER, state:

## INTRODUCTION AND AGENT BACKGROUND

1.       As a law enforcement officer of the United States, I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in the United States Code ("U.S.C."). I am a Special Agent with the United States Department of Health and Human Services, Office of Inspector General ("HHS-OIG"). I worked at the Boston office of HHS-OIG from August 2005 to April 2009 and from May 2016 to the present. I hold a Bachelor of Arts in Psychology.

2.       As a Special Agent with HHS-OIG, I am responsible for investigating allegations of health care fraud affecting public health care benefit programs such as Medicare and Medicaid. I have participated in a variety of such investigations, during the course of which I have interviewed witnesses, conducted physical surveillance, executed arrest and search warrants, and reviewed various forms of evidence including website and email data, Medicare and Medicaid claims data, medical records, invoices, and other business records.

3.       Through my training, education, and experience, I am familiar with a variety of fraud schemes involving public health care benefit programs. I have participated in numerous investigations into health care fraud and the provision of kickbacks to health care providers to induce the purchase of pharmaceuticals, medical devices, or medical services, in violation of 18 U.S.C. § 1347 (Health Care Fraud) and 42 U.S.C. § 1320a-7b (the Anti-Kickback Statute).

4.       I am currently investigating Gustavo KINRYS ("KINRYS") and the Boston Center for Clinical Research LLC ("BCCR"), and other as-yet unknown or unidentified subjects (collectively, the "TARGET SUBJECTS") for a number of offenses, including healthcare fraud,

in violation of 18 U.S.C. § 1347, wire fraud in violation of 18 U.S.C. § 1343, false statements

relating to healthcare matters in violation of 18 U.S.C. § 1035, and violations of the Anti-

Kickback statute, 42 U.S.C. § 1320a-7b(b) (collectively, the "TARGET OFFENSES").  The

investigation is a joint criminal investigation that the United States Attorney's Office for the

District of Massachusetts and HHS-OIG (collectively, "the Investigative Team") are conducting.

5.      Gustavo KINRYS is a psychiatrist.  He owns BCCR, which is located at 67 Union

Street, Suite 401, Natick, Massachusetts.  (KINRYS has also referenced his practice at that same

location as Advanced TMS Associates and Psychservices Counseling Center.)  Based on the

investigation to date, I submit that there is probable cause to believe that KINRYS and BCCR

are billing Medicare and private insurers for various types of medical services that were not, in

fact, provided.

## PURPOSE OF AFFIDAVIT

6.      I submit this affidavit in support of an application for a warrant under 18 U.S.C.

§ 2703(a) and Rule 41 of the Federal Rules of Criminal Procedure to search and seize records

and data, specifically any electronic calendar or calendars, associated with the following e-mail

account identified as the "TARGET ACCOUNT" throughout this affidavit.

gustavo.kinrys@gmail.com

7.      I have probable cause to believe that the electronic calendar associated with the

TARGET ACCOUNT contains evidence, fruits, and instrumentalities of the crimes identified

above, as described in Attachment B.

8.      Based on the e-mail address's domain name, I have probable cause to believe that

the TARGET ACCOUNT and relevant data are maintained by Google, Inc. ("Google"), which,

2

government databases indicate, accepts service of process at 1600 Amphitheatre Parkway,

Mountain View, CA 94043 and via website at https://support.google.com/legal-

investigations/contact/LERS as described in Attachment A.

9.      The facts in this affidavit come from personal observations, training, experience,

review of records, and information obtained from witnesses and other law enforcement officers.

This affidavit includes only those facts that I believe are necessary to establish probable cause

and does not include all of the facts uncovered during this investigation.

## PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS COMMITTED

10.     The investigative team has developed information indicating that KINRYS has

billed Medicare and private insurers for hundreds of thousands of dollars' worth of medical

treatments and psychotherapy that he did not, in fact, render to his patients.  Information that

patients of KINRYS and former employees of BCCR have provided, as well as documents from a

third party reflecting KINRYS's use of certain medical devices, show that KINRYS

misrepresented the amount and the frequency of medical treatments he provided to numerous

patients.  In early 2018, when Medicare and certain private insurers began to question the claims

for reimbursement submitted on behalf of KINRYS, KINRYS began directing BCCR employees

to create false documentation to provide (false) back-up for his claims for reimbursement.  In

addition, former patients have provided information indicating that KINRYS was routinely

waiving patient copayments, which can amount to a violation of the Anti-Kickback Statute if

done for Medicare beneficiaries.

11.     Since early 2018, HHS-OIG has been investigating KINRYS and BCCR for

questionable billing practices.  Data from the Centers for Medicare & Medicaid Services

("CMS") revealed that Medicare paid KINRYS a total of $840,349 between January 1, 2017 and March 30, 2018.  The average amount CMS paid KINRYS per beneficiary was more than 30 times higher than the average CMS paid a provider in KINRYS's peer group.  Over 66% of the amount paid to KINRYS represented payments for a treatment called Transcranial Magnetic Stimulation ("TMS") that KINRYS and BCCR purportedly provided to patients.

**TMS Therapy and the NeuroStar TMS Therapy System**

12.    TMS is a noninvasive method of brain stimulation used to treat adults who have a confirmed diagnosis of major depressive disorder.  Neuronetics, Inc. sells a medical device used to provide TMS therapy to patients called the NeuroStar TMS Therapy System.  According to the FDA 510K, or Premarket Notification, for the NeuroStar TMS Therapy System, it is a computerized, electromechanical medical device that produces and delivers non-invasive, magnetic stimulation using brief duration, rapidly alternating, or pulsed, magnetic fields to induce electrical currents directed at spatially discrete regions of the cerebral cortex.  In addition to selling the NeuroStar TMS Therapy System device, Neuronetics also sells bundles of treatment sessions to doctors.  The NeuroStar TMS Therapy System is designed so that the number of TMS treatment sessions a user (like KINRYS) can provide to patients is limited to the number of TMS treatment sessions that user (e.g., KINRYS) has purchased from Neuronetics.

13.     A photograph of the NeuroStar TMS Therapy System is below:



14.     According to Neuronetics' website, the NeuroStar TMS Therapy System is an in-office treatment that has been cleared to be performed in as little as 19 minutes (but may take up to 39 minutes due to patient sensitivity or at the discretion of the treating psychiatrist) per session.  The treatment is performed while the patient is awake, alert and is seated and reclined in the NeuroStar treatment chair.  Neuronetics literature states that a course of TMS treatment consists of sessions administered for five days a week for up to six weeks.

15.     During a patient's first treatment session, two essential steps are performed.  First, the patient's cortex is mapped with the NeuroStar Treatment Coil to identify the motor cortex. Once the specific location on the motor cortex is found, the second step involves the use of a proprietary software algorithm, which assists the provider in estimating the physiologically

appropriate magnetic field intensity for each treatment session.  After these two steps are

performed, the location of the motor cortex then also serves as a reference point to enable the

psychiatrist to properly position the NeuroStar Treatment Coil over the prefrontal cortex, resting

the coil lightly in contact with the patient's scalp.  Once the coil is properly positioned, the

device delivers NeuroStar TMS Therapy using a highly targeted, pulsed magnetic field to

stimulate cortical neurons.

16.    Medicare provides coverage for this TMS treatment and requires that a physician

(MD or DO) who writes an order for the TMS treatment examine the patient and review the

patient's record.  Both CMS and private insurance carriers require that the physician have

experience in administering TMS therapy and that the treatment be given under direct

supervision of this physician.  In other words, the physician must be in the area where the TMS

therapy is being provided and be immediately available.

**Waivers of Copayments and the Anti-Kickback Statute**

17.    Part of the government's investigation into KINRYS and BCCR has focused on

potential violations of the Anti-Kickback Statute ("AKS").  Under the AKS, it is illegal to

provide "any remuneration" to induce a person to order goods under a federal health care

program.  *See* 42 U.S.C. 1320a-7b(b)(2).  In passing the AKS, Congress intended the term "any

remuneration" to be understood broadly.  H. R. Rep. No. 95-393 (1977), at 53, in 1977

U.S.C.C.A.N.N. 3039, 3056 ("The bill would define the term 'any remuneration' broadly to

encompass kickbacks, bribes, or rebates which may be made directly or indirectly, overtly or

covertly, in cash or in kind (but would exclude any amount paid by an employer to an employee

for employment in the provision of covered items or services).").  Congress considered such

inducements to "contribute significantly to the cost" of federal health care programs. *Id.* at 52, in

3055.

18.    Since at least 1994, HHS-OIG has interpreted routine Medicare copayment waivers

as violations of the AKS under certain circumstances.  Publication of OIG Special Fraud Alerts,

59 Fed. Reg. No. 242 (page no. not available) (Dec. 19, 1994), available at

https://www.gpo.gov/fdsys/pkg/FR-1994-12-19/html/94-31157.htm.  The "[r]outine waiver of

deductibles and copayments by charge-based providers, practitioners or suppliers is unlawful

because it results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive

utilization of items and services paid for by Medicare."  The OIG's rationale combined an

understanding of the role of copayments in managing costs, on the one hand, with AKS

inducement concerns, on the other: "At first glance, it may appear that routine waiver of

copayments and deductibles helps Medicare beneficiaries.  By waiving Medicare copayments

and deductibles, the provider of services may claim that the beneficiary incurs no costs.  In fact,

this is not true.  Studies have shown that if patients are required to pay even a small portion of

their care, they will be better health care consumers, and select items or services because they are

medically needed, rather than simply because they are free.  Ultimately, if Medicare pays more

for an item or service than it should, or if it pays for unnecessary items or services, there are less

Medicare funds available to pay for truly needed services." *Id.*

**KINRYS's 2015 Purchase of the NeuroStar TMS Therapy System**

19.    In May 2015, KINRYS purchased a NeuroStar TMS Therapy System from

Neuronetics for $76,650.  He also purchased 100 NeuroStar Treatment links or treatment

sessions for $9,800.  KINRYS financed the purchase of the NeuroStar TMS Therapy System

through Marlin Leasing Corporation.  In doing so, he identified BCCR, located at 67 Union St,

Suite 401, Natick, as the customer.  The Neuronetics customer enrollment form identifies

KINRYS as the owner of BCCR and lists his physician's license number as 210468 and his

email address as kinrys@aol.com.  The customer contact and billing contact listed on the

Neuronetics-BCCR purchase documents is zcarvalho@bostonclinresearch.org.

20.    KINRYS and BCCR began offering TMS therapy to patients at KINRYS's Natick-

based psychiatry practice shortly after May 2015.  KINRYS began billing Medicare for TMS

therapy it supposedly provided to his patients beginning in June 2015.  When doing so, KINRYS

used the following current procedural terminology ("CPT") codes titled "therapeutic repetitive

transcranial magnetic stimulation (TMS) treatment": 90867, 90868, and 90869.

21.    Since June 2015, KINRYS has billed the following third party payors the following

amounts for purportedly providing TMS therapy:

   - BCBS:  $6.67 million (reimbursed $1.8 million)

   - Medicare:  $3.2 million (reimbursed $815,000)

   - Tufts Medical Plan:  $1.28 million (reimbursed $319,000)

   - Tufts Commercial:  $723,000 (reimbursed $366,000)

   - Optum:  $420,000

Medicare claims data indicates that KINRYS consistently has been among the top providers of

TMS therapy nationwide since he began billing for TMS in June 2015.  He has billed for

hundreds of TMS treatments to individual patients.  Medicare claims data indicates that KINRYS

typically provides TMS treatments to a patient at a frequency of five days per week for the

patient's duration of TMS therapy (with the exception of major holidays).

22.     Investigators have interviewed ZC and AZ, both of whom worked for KINRYS at BCCR.  ZC worked for KINRYS at BCCR from 2013 until her resignation in July 2018. According to documents obtained from Neuronetics, ZC was the administrator of KINRYS's and BCCR's NeuroStar account.  Initially, ZC served as the sole TMS technician at BCCR.  By the summer of 2015, KINRYS had hired another employee, AZ, who among other things, assisted ZC with the TMS therapy.  As the two TMS technicians for BCCR, ZC or AZ scheduled and assisted KINRYS with the initial TMS mapping session (billed under CPT code 90867) that he conducted on each new TMS patient.  After a patient's initial session, ZC or AZ scheduled and administered the subsequent TMS sessions (billed under CPT code 90868) for all TMS patients. ZC typically worked at KINRYS's Natick office Monday through Thursday.  AZ's hours increased over time and by the time she quit in April 2018, she was working Monday through Friday.  KINRYS usually came to BCCR's office on Tuesdays and Wednesdays to see patients for psychotherapy and came into the office on some Thursdays primarily to conduct the initial TMS mapping sessions on new TMS patients.

**KINRYS's False Billing for TMS Therapy Not Provided**

Patient PM

23.     Patient PM began seeing KINRYS in the late summer / early fall of 2016. According to Medicare systems data, KINRYS generally billed Medicare as though Patient PM received TMS treatment 5 times per week.  In total, KINRYS submitted claims to Medicare for 130 TMS treatments administered to Patient PM between November 28, 2016 and May 26, 2017 for a total amount billed of $62,310.  Medicare reimbursed KINRYS $13,028 for the TMS services supposedly rendered to Patient PM.

9

24.     According to Patient PM's wife, however, Patient PM did not receive TMS treatments in this amount or in this frequency.  Specifically, Patient PM's wife noted that Patient PM never received TMS therapy at KINRYS's office 4-5 times per week.  Instead, PM received TMS therapy – at most – three days per week, eventually tapering down to one day per week before stopping TMS therapy altogether.  In September 2018, Patient PM's wife requested from BCCR a list of Patient PM's visits.  The list of visits that BCCR emailed to Patient PM's wife (1) indicate that Patient PM received a total of 28 TMS treatments, which occurred between December 8, 2016 and April 4, 2017, and (2) corroborate Patient PM's wife's recollection in that it reflected that the frequency with which Patient PM typically received TMS treatments was 2-3 times per week – not 4-5 times per week.

25.     Patient PM's wife's recollection is also corroborated by data from Neuronetics, the company that sold KINRYS and BCCR the two NeuroStar TMS Therapy systems KINRYS and BCCR used.  Neuronetics maintains data showing when and how frequently the two NeuroStar TMS Therapy systems Neuronetics sold to BCCR were used.  Neuronetics' data shows that Patient PM received only 28 TMS treatments – far fewer than the 130 reflected in the Medicare systems data – and that that Patient PM never received treatment 4-5 times per week.

26.     On July 10, 2018, HHS-OIG issued a subpoena to KINRYS in which it requested medical records for all services rendered to a number of KINRYS's patients, including Patient PM.  In response to that subpoena, KINRYS produced a document called "Neurostar TMS Therapy Patient Report," which lists 115 TMS treatments administered to Patient PM by KINRYS or employees working for KINRYS – more than four times the number of TMS treatments Patient PM received according to internal BCCR records and internal Neuronetics

10

data.  KINRYS signed this NeuroStar TMS Therapy Report before it was submitted to the

government as part of KINRYS's subpoena response.

### Patient RP

27.    According to Medicare systems data, Patient RP began seeing KINRYS in August

2017.  KINRYS billed Medicare $70,200 for 147 separate TMS services purportedly provided to

Patient RP by KINRYS between August 14, 2017 and March 9, 2018.  Medicare systems data

indicates Medicare reimbursed KINRYS $14,763 for the TMS services supposedly rendered to

Patient RP.  According to ZC and AZ, Patient RP never received TMS therapy at KINRYS's

office.  At one point, Patient RP complained to AZ that her insurance had been improperly

charged.

28.    Contrary to what appears in the Medicare systems data, Neuronetics' records reveal

that Patient RP received no TMS treatments at KINRYS's office.  This documentation also

corroborates the accounts provided by ZC and AZ.

### Patient JR

29.    Patient JR was referred to KINRYS in 2016 and began receiving TMS therapy at

KINRYS's offices beginning in July 2016 and ending with her last TMS therapy session in the

fall of 2017.

30.    According to Medicare systems data, KINRYS billed Medicare $184,760 for 387

separate TMS treatments purportedly provided to Patient JR between July 18, 2016 and February

9, 2018.  That data reflects that Patient JR usually received the TMS treatments 5 times per

week. Medicare data indicates KINRYS was reimbursed $42,931 for the TMS services

supposedly rendered to Patient JR.

11

31.     Contrary to what appears in the Medicare systems data, Neuronetics' records reveal that Patient JR received a total of 88 sessions of TMS therapy at KINRYS's office – far fewer than the 387 treatments reflected in the Medicare systems data.

32.     Patient JR stated that she was never charged any amount, including any copayment, for services provided by KINRYS.

Patient IC

33.     Patient IC is KINRYS's wife.  According to Blue Cross Blue Shield of Massachusetts ("BCBSMA") claims data, KINRYS billed BCBSMA $230,070 for TMS therapy supposedly provided to Patient IC.  BCBSMA reimbursed KINRYS $96,004 for TMS therapy supposedly provided to Patient IC.

34.     According to ZC, Patient IC never received TMS therapy at KINRYS's office. AZ said she never saw Patient IC receiving TMS therapy at KINRYS's office.  Consistent with ZC's and AZ's accounts, Neuronetics records reveal that Patient IC never received TMS treatments at KINRYS's office.

Patient SL

35.     Patient SL became a patient of KINRYS's and BCCR in the fall of 2017 and began receiving TMS treatments at KINRYS's office in Natick at that time.  Patient SL reported that he received his last TMS therapy session at BCCR around the first week of January 2018.

36.     According to Medicare systems data, KINRYS billed Medicare $36,845 for 76 separate TMS services purportedly rendered to Patient SL between September 25, 2017 and January 12, 2018.  Medicare reimbursed KINRYS $8,462 for TMS therapy supposedly provided to Patient SL.

37.    Patient SL reported that he maintains small red appointment books where he records various appointments, including visits to KINRYS's office.  I have seen these red appointment books.  Based on Patient SL's review of his 2017 and 2018 appointment books, Patient SL noted that – contrary to what was reflected in the Medicare systems data – he received TMS therapy at BCCR a total of 38 times on the following dates:

October 2017: 2, 4, 5, 10, 11, 12, 17, 18, 19, 24, 25, 27, and 30

November 2017: 1, 3, 6, 8, 10, 13, 15, 17, 20, 22, 27, and 29

December 2017:  1, 4, 6, 8, 11, 13, 15, 18, 20, 22, and 27

January 2018:  3 and 5.

38.    Patient SL also reported that he received Explanation of Benefits ("EOB") documents from his insurance providers.  In reviewing those EOBs he received from his supplemental insurance provider, he noticed that someone had submitted claims for alleged TMS treatments provided to him on January 9-11, 2018.  Patient SL had not, in fact, received TMS treatments during this time.  Review of additional records shows that, during this three-day timeframe, Patient SL actually was receiving inpatient care at MetroWest Medical Center for a gastrointestinal bleed, which would have prevented him from receiving TMS treatments at BCCR.

39.    Consistent with Patient SL's report, Neuronetics records reveal that he received only 37 TMS treatments at KINRYS's office – not the 76 treatments KINRYS billed Medicare for.

40.    As mentioned above, certain insurance carriers require that patients pay a copayment for the TMS treatments they receive.  Patient SL reported that he never paid any

13

money out-of-pocket for the TMS treatment he received.  While there was a small amount of money that Patient SL's insurance did not cover and for which he was responsible, Patient SL reported that KINRYS told him that KINRYS "did fine" with the insurance reimbursement and did not need the patient's share.  According to Patient SL, KINRYS said that because TMS was a frequent and intense therapy, he did not collect copayments from patients.

41.    I have found additional examples where Medicare or private insurance companies were billed for TMS treatments KINRYS supposedly provided to patients, but where data from Neuronetics showed that those same patients either (a) received no TMS treatments at KINRYS's office, or (b) received far fewer TMS treatments at KINRYS's office that the number of treatments for which KINRYS was seeking reimbursement.

**<u>KINRYS and His Staff Create and Store False Documentation Concerning KINRYS's Patients in Response to Insurer's Record Requests</u>**

<u>KINRYS's and BCCR Staff's Use of a Dropbox Account</u>

42.    ZC, who worked for KINRYS at BCCR between 2013 and July 2018, reported that KINRYS and BCCR staff stored work-related documents in a Dropbox.com[1] account installed on the computers at BCCR.  AZ confirmed this.  KINRYS set up the Dropbox account for the practice.  Initially, KINRYS emailed a password for the practice's Dropbox account to ZC and another BCCR employee, AZ, so they could install Dropbox on their desktop computers at

---

[1] Dropbox is a file hosting service that offers "cloud" storage and file synchronization. Dropbox offers free and paid services that allow users to add photos, documents, videos and files to their account. Dropbox automatically saves these files to all of the user's computers, phones and to the Dropbox server, so they may be accessed from anywhere. Dropbox offers a free plan that allows users to have 2 GB of space to store their files. Dropbox also offers plans that cost $9.99 a month and allow users additional space on the Dropbox servers.

KINRYS's office.

43.    Once ZC had access to Dropbox on her computer at BCCR, she no longer needed to use the password to access and save documents to the Dropbox account.  According to ZC, the files saved to the Dropbox account included prescriptions for KINRYS's patients, letters for KINRYS's patients, TMS Reports for KINRYS's patients, consent forms for KINRYS's patients, employee timesheets, and letters from insurance companies.

44.    KINRYS worked from home at times.  ZC said that KINRYS would save documents to Dropbox and alert ZC that the documents could be found in the Dropbox account. Sometimes, KINRYS would send ZC a link via email to a document in the Dropbox account so ZC could access the document at BCCR.  ZC stated that KINRYS would sometimes send ZC and other BCCR employees an alert to access the Dropbox account.

<u>KINRYS Directs AZ to Create False Reports of TMS Therapy</u>

45.    In February 2018, KINRYS began directing one of his staff members, AZ, to create false reports representing that certain patients of KINRYS's received TMS therapy when, in fact, they had not.

46.    Around February 2018, KINRYS had received a number of medical records requests from insurers for specific patients.  KINRYS asked AZ to (falsely) create a report for each of the patients identified in the medical record requests that would show that the patient received TMS therapy five days per week for a total of 36 sessions.  AZ told KINRYS that the patients had not, in fact, received that many TMS sessions and that she did not feel comfortable creating the reports that represented that they had.  Initially, KINRYS said OK and did not pressure her.

47.     Later, however, KINRYS became upset that AZ had not created the false TMS reports for the patients he identified.  KINRYS directed AZ to create a template that could be used to create the false TMS reports for the patients identified by KINRYS.  AZ showed several templates to KINRYS, but KINRYS rejected them because they were "too detailed."  Ultimately, KINRYS approved a template AZ found and again told her to create records for patients showing that they had received TMS therapy five days per week for 36 sessions.  I showed AZ a copy of a Neurostar TMS Therapy Patient Report that KINRYS produced in response to an HHS-OIG subpoena.  AZ confirmed that the form of this Neurostar TMS Therapy Patient Report was the template AZ found and that KINRYS approved.

48.     Initially, KINRYS gave AZ a list of approximately 20 patients for whom he ordered her to create reports showing – falsely – that those patients had received TMS therapy five days per week for 36 sessions.  AZ noted that certain patients on that list had never received TMS therapy and told KINRYS it was wrong to create TMS reports for those patients.  Despite this, KINRYS continued to pressure AZ to create TMS reports falsely reflecting that patients had received TMS therapy 5 days per week when, in fact, they had not.

49.     KINRYS also provided AZ with direction regarding the content of the notes of the TMS reports.  For example, KINRYS told AZ that the notes for each patient should change over time to indicate that the patient was doing better.  KINRYS told AZ that the notes could not look exactly the same.  AZ saved the false TMS reports she created at KINRYS's direction in the Dropbox account KINRYS created for the office.

50.     Later in the Spring of 2018, KINRYS increased his demands and ordered AZ to create TMS reports in response to all medical record requests that came into KINRYS's office

from insurance companies.  At one point, AZ told KINRYS that she was not going to make the

TMS reports anymore.  KINRYS responded that AZ had to do it, and that it was part of her job.

On or about April 4, 2018, KINRYS had the following exchange with AZ over text message:

> KINRYS to AZ:
>
>> I don't think I can handle too many people tomorrow. Still sick.
>> But will try.  Thank you for your help!
>> Do you think you can get to those TMS notes this week? Maybe
>> Camila can help? we need to send some of those out.
>> Keep them simple.  They look perfect.
>
> AZ to KINRYS
>
>> Can we discuss this in the office tomorrow?
>
> KINRYS to AZ
>
>> OK. But it has to be done. I don't have the time. It is part of the
>> job. That will not change.
>> That is not open for discussion.
>> Assign it to someone else.  But it has to be done by someone. I
>> need them by the end of the week please.
>> Please stop overthinking things that you think you fully
>> understand.

51.   I have seen a screenshot of this text exchange between KINRYS and AZ on AZ's

phone.  On or about that same day, before AZ notified KINRYS of her decision to quit, she sent

a text message to ZC's phone stating:

> I am very sorry to do this to you [ZC], but this has really gotten too
> far. I can't be bullied by G to forge records. He was really mean to
> me and I don't want to be in this situation.  I don't think I will
> come on Friday.

52.   I have seen this text message from AZ on ZC's phone.  According to ZC, ZC and

AZ called KINRYS by his first name, Gustavo.  ZC said that she understood "G" in the text

message to refer to KINRYS.

53.     ZC provided information consistent with what AZ reported.  ZC stated that, at some point in February 2018, she learned that KINRYS had instructed AZ to create false records representing that certain patients of KINRYS received TMS therapy even in instances when those patients had not, in fact, received such therapy.  At that time, ZC saw AZ with files that contained printed letters from insurance companies.  Among other things, those letters requested that KINRYS turn over medical records for particular patients and particular dates of service.

54.     ZC reported that AZ told ZC that KINRYS ordered AZ to create false notes relating to TMS therapy.  At one point, AZ showed ZC what appeared to be a Microsoft Word document with the title "Neurostar TMS Therapy Patient Report" at the top of it.  The report was up on AZ's desktop computer screen at the time, which was located in the reception area of BCCR.  ZC stated that this was the first time she saw this type of document pertaining to TMS therapy, despite the fact that ZC had been working at BCCR since KINRYS had purchased the first NeuroStar TMS Therapy system from Neuronetics in 2015.

55.     ZC reported that AZ told ZC that KINRYS was making AZ create NeuroStar TMS Reports for 36 days of TMS therapy for patients who did not, in fact, receive 36 sessions of TMS.  ZC stated that KINRYS forced AZ to create the Neurostar TMS Reports, that AZ did not like creating the NeuroStar TMS Reports, and that AZ did not want to sign AZ's name to the NeuroStar TMS Reports that AZ created.

56.     AZ told ZC that AZ saved the false NeuroStar TMS Reports AZ created to the Dropbox file KINRYS had created.  ZC has seen NeuroStar TMS Reports that AZ created in the Dropbox file.  At KINRYS's instruction, ZC faxed some of the NeuroStar TMS Reports that AZ created to insurance companies in response to their medical records requests.

18

<u>KINRYS Directs ZC to Create False TMS Reports</u>

57.     ZC stated that in May 2018, KINRYS approached her with a bag of letters from insurers – including letters seeking medical records – and told her, "These are what [AZ] started and I need you to continue."  KINRYS told ZC that ZC needed to finish the NeuroStar TMS Therapy Patient reports for every patient.  KINRYS told ZC that he had told AZ to finish the NeuroStar TMS Therapy Patient Reports for the Medicare patients; ZC believed that KINRYS thought AZ had completed those reports by the time AZ quit.

58.     KINRYS instructed ZC to create a NeuroStar TMS Therapy Patient Report for each patient with notes for 36 or 72 consecutive dates of service, excluding weekends and holidays. For some patients, KINRYS told ZC to use the date the insurance approved TMS therapy for the patient (*i.e.,* the prior authorization date) as the first date of service to put in the false NeuroStar TMS Therapy Patient Report.  For others, KINRYS said ZC should use the date the patient first received TMS (*i.e.*, the mapping session) as the first date of service in the NeuroStar TMS Therapy Report.  In addition, when KINRYS received a medical record request letter from an insurance provider (including Medicare), he told ZC to create NeuroStar TMS Therapy Report with notes for each weekday, excluding holidays, for the period of time requested in the letter.

59.     ZC used screenshots from the NeuroStar TMS therapy system to identify all of KINRYS's patients who had received any amount of TMS therapy.  ZC then created NeuroStar TMS Therapy Patient Reports according to KINRYS's instructions for these patients, continuing from where AZ left off when AZ resigned. ZC created and saved all the NeuroStar TMS Therapy Reports in the practice's Dropbox account.  ZC also accessed the reports AZ had created in the Dropbox account and modified them as necessary according to KINRYS's instructions.

19

After ZC and AZ Resign, KINRYS Has MB Create TMS Reports

60.    Investigators have interviewed SB.  SB worked for KINRYS at BCCR from April 2018 to September 2018.  SB stated that MB, who still works at BCCR, began working for KINRYS around June 2018.  SB said that MB did TMS notes for KINRYS.  SB explained that ZC had done the TMS notes and then ZC showed MB how to do the TMS notes for KINRYS before ZC stopped working at BCCR.  When I showed SB a sample NeuroStar TMS Therapy Patient Report, which KINRYS produced in response to the HHG-OIG subpoena, she confirmed that it looked the same as the TMS notes ZC and MB had done.  SB did not create the TMS Reports, but she knew that the information was "copied and pasted," meaning she knew that ZC and MB would copy a note from one date of service in the report and paste the same note to another date of service in the report.

61.    SB stated that MB would sometimes tell SB and the other women working at KINRYS's office that MB could not help with certain office duties because MB had to do the TMS notes for KINRYS.  The notes were kept on the office computer, but SB was not given access to them.  MB was given access to the TMS notes.  SB also stated that MB emailed with KINRYS a lot at their bostonclinresearch.org email addresses about the TMS notes.  SB knew this because MB told SB that KINRYS and MB emailed a lot about the notes and that KINRYS texted her about the TMS notes as well.  Additionally, SB's computer at BCCR was located next to MB's computer so SB saw that MB received emails from KINRYS about the TMS notes.  SB stated that MB received emails from KINRYS that the other staff members did not receive.  This stood out to SB because KINRYS usually addressed emails to his office staff to all the women who worked in reception and did TMS at BCCR.

20

**KINRYS's Billing Insurance Carriers for Psychotherapy Treatment Not Actually Provided**

      Patient KM

62.    Patient KM began seeing KINRYS in July or August 2016 as KM was getting ready to begin college in New Hampshire, approximately one hour away from his home in Massachusetts.  Patient KM wanted to start on a course of medication to treat KM's Attention Deficit Hyperactivity Disorder ("ADHD").  Patient KM saw KINRYS at his office approximately three to four times in total during the July-August 2016 timeframe. In the first week of September 2016, Patient KM left home to begin attending college in New Hampshire. While Patient KM received at least two prescriptions from KINRYS in the mail after September 2016, Patient KM never met with KINRYS and never spoke with KINRYS by phone after August 2016.

63.    Patient KM's insurance carrier in the second half of 2016 was Harvard Pilgrim HealthCare ("HPHC"). Patient KM's father was the primary subscriber for the HPHC insurance carrier that covered his child, Patient KM. Patient KM's father noticed that after Patient KM left for college in New Hampshire in September 2016, he continued to receive Explanation of Benefit forms ("EOB's") from HPHC for services KINRYS allegedly provided to Patient KM. Patient KM's father estimated that his insurance carrier, HPHC, was being billed approximately $600 per week for services KINRYS allegedly provided to Patient KM. Patient KM's father thought this was suspicious and contacted Patient KM at college and confirmed that Patient KM was no longer seeing KINRYS.  Patient KM's father contacted HPHC to complain about the EOBs pertaining to Patient KM and to make HPHC aware of the fact that Patient KM was no longer receiving therapy from KINRYS. Patient KM's father also spoke with a representative

21

from KINRYS's office by phone and complained about the EOBs he was receiving for Patient KM's treatment, noting that Patient KM was away attending college.

64.    The investigative team has obtained documentation from HPHC concerning claims submitted to HPHC's billing group for treatment purportedly provided to Patient KM.  That documentation indicates KINRYS billed for psychotherapy allegedly provided to Patient KM on the following 18 different dates between September 2016 and January 2017 when Patient KM was attending college in New Hampshire:

> September 2016: 14, 20, 27
>
> October 2016: 4, 11, 18, 25
>
> November 2016: 1, 8, 15, 22, 29
>
> December 2016: 6, 13, 20, 27
>
> January 2017: 3, 10.

In addition, Patient KM's father stated that he and his family – including Patient KM – were in Brazil from December 24, 2016 through January 9, 2017. It would have been impossible for Patient KM to receive psychotherapy from KINRYS at his office on December 27, 2016 and January 3, 2017.  Patient KM's father also stated that he never sent a copayment to KINRYS and that Patient KM's father never received a bill from KINRYS's office indicating he owed a copayment.

> Patient SY

65.    Patient SY began seeing KINRYS for TMS therapy in the summer of 2017. According to Medicare systems data, KINRYS billed Medicare $15,870 for 26 psychotherapy sessions (and concurrent Evaluation and Management ("E&M") services) he supposedly

provided Patient SY between June 1, 2017 and September 1, 2017, including sessions provided

on July 7, 10, 14, 17, 21, and 24, 2017.  Similarly, in response to an IG subpoena for medical

records, KINRYS turned over psychotherapy notes for 24 sessions of psychotherapy that he

supposedly provided to Patient SY between 6/1/2017 and 9/1/2017, including notes for sessions

on July 7, 10, 14, 17, 21, and 24.  Kinrys concluded each of these 24 psychotherapy session notes

with the following statement: "Time spent face to face with patient and/or family and

coordination of care: 52-67 minutes."

66.     Contrary to these representations by KINRYS, Patient SY explained that he never

received psychotherapy from KINRYS.  ZC, who worked at KINRYS's office, confirmed this.

Moreover, records from the United States Customs and Border Patrol shows that KINRYS flew

from Boston, MA to Zurich, Switzerland on July 7, 2017 and that KINRYS did not return until

July 24, 2017, making it impossible for KINRYS to have provided psychotherapy to Patient SY

"face to face" on July 14, 17, and 21, 2017.

             Patient MS

67.     Patient MS began seeing KINRYS for TMS therapy in the Spring of 2017.  Patient

MS denied getting psychotherapy from KINRYS.  Patient MS stated that he did not see KINRYS

for anything other than TMS therapy.  Patient MS said he already had a psychiatrist when he

began TMS therapy at KINRYS's office; Patient MS continued to see that psychiatrist during the

period he was undergoing TMS therapy.  ZC confirmed that Patient MS did not do much

psychotherapy with KINRYS, but that the patient would sometimes check in with KINRYS after

a TMS treatment.

68.     Patient MS reported, however, that Patient MS did see a "Dr. Ana" at KINRYS's

office for psychotherapy.  Ana O was interviewed as part of this investigation.  Ana O worked as

a therapist at KINRYS's Natick office from late 2016 until October 2017. Ana O reported that

she is not a licensed psychologist in the U.S. but she is licensed in Brazil.  Ana O stated that she

saw roughly 30 of KINRYS's patients for psychotherapy visits during this time.  Ana O

confirmed that Patient MS was one of these patients and that she saw Patient MS for therapy

sessions twice per month.  Ana O stated that she is not a U.S. citizen but was supposed to be

doing research under KINRYS at Massachusetts General Hospital through a J-1 Visa.  She

confirmed that KINRYS was aware of this.

     69.    Medicare systems data shows that KINRYS billed Medicare for 99 psychotherapy

sessions that KINRYS supposedly provided to Patient MS between March 2017 and March

2018.  This is inconsistent with the information Patient MS, Ana O and ZC provided regarding

psychotherapy services allegedly provided to Patient MS at KINRYS's office.  The data

indicates that KINRYS usually billed Medicare for providing psychotherapy two times per week

to Patient MS.  According to Medicare systems data, KINRYS billed Medicare for $60,400 for

psychotherapy and the medical evaluation and management services he supposedly provided to

Patient MS with the psychotherapy.  The data shows Medicare reimbursed KINRYS $14,104.48

for these services.

     70.    In response to an IG subpoena for medical records, KINRYS turned over

psychotherapy notes for 24 sessions of psychotherapy he supposedly provided to Patient MS

between June 6, 2017 and September 7, 2017.  The dates of service for these notes indicate

KINRYS was providing psychotherapy to Patient MS twice per week for the majority of this

period of time.  In the "LEVEL OF CARE JUSTIFICATION" section of each of these 24 notes,

KINRYS included the following note: "Return 2x per week. Call prn." He also included in each

of the 24 notes the following statement: "Time spent face to face with patient and/or family and

coordination of care: 52-67 minutes."  KINRYS's signature is beneath this statement, at the end

of each note.

### PROBABLE CAUSE TO BELIEVE THAT THE TARGET ACCOUNT CONTAINS EVIDENCE, FRUITS, AND INSTRUMENTALITIES OF THE CRIMES IDENTIFIED ABOVE

71.    I submit that there is probable cause to believe that the Google calendar associated

with the TARGET ACCOUNT contains evidence, fruits, and instrumentalities of the crimes

identified above.

72.    The investigation to date demonstrates that KINRYS and BCCR staff used Google

calendars to schedule, track and record the dates and times of psychotherapy and TMS therapy

appointments for BCCR's patients.  The investigation also indicates that one of the Google

calendars used to track these appointments likely is associated with the TARGET ACCOUNT.

**KINRYS Set Up @bostonclinresearch.org Accounts for BCCR Employees and Used Shared Google Calendars to Track Appointments for Psychotherapy and TMS Treatment**

73.    According to ZC, there are several computers at BCCR: one computer is located at

the front desk, two computers are located in the reception area, and one more computer is located

in KINRYS's office, which only KINRYS uses.

74.    ZC stated that KINRYS set up @bostonclinresearch.org email accounts for each

employee at his office.  Based on training and experience, I was able to determine that the

@bostonclinresearch.org accounts were set up using Google as a hosting provider.  Moreover,

Google provided subscriber information for multiple @bostonclinresearch.org email accounts,

including gkinrys@bostonclinresearch.org (an email account used by KINRYS himself), and

25

tms1@bostonclinresearch.org and tms2@bostonclinresearch.org (both discussed further below).

75.     I understand Google offers a time-management application called Google Calendar. Users are required to have a Google account in order to use this application.

76.     Google has also provided subscriber information for the TARGET ACCOUNT. The subscriber information provided by Google includes the subscriber name (Gustavo Kinrys), the email address (Gustavo.kinrys@gmail.com), the creation date (July 17, 2005), and information concerning recent logins.  The subscriber information also indicates that Google Calendar is among the services associated with the TARGET ACCOUNT.

77.     Based on my training and experience, as well as conversations with other agents, I know that small medical practices keep track of patient scheduling and appointments using computerized calendars to which practice employees have access.  Based on information from employees of BCCR, BCCR kept track of patient scheduling and appointments using computerized calendars.

78.     KINRYS and certain members of his BCCR staff, including at least ZC and AZ, used a Google calendar to schedule patients.  KINRYS gave access to the Google calendar to staff at BCCR so they could view the calendar and add appointments to KINRYS's schedule. ZC said that ZC and AZ entered 80-90% of the appointments into the Google calendar.

79.     A search warrant was previously obtained and executed for information pertaining to AZ's and ZC's Google-based email accounts (azawadka@bostonclinresearch.org and zcarvalho@bostonclinresearch.org, respectively).

80.     The return from that search warrant shows only two emails between the TARGET ACCOUNT and ZC's email account.  The emails were identical and sent one minute apart on

26

January 30, 2013.  The email header information for those emails is as follows:

**From:**  "Google Calendar <calendar-notification@google.com> - on behalf of - gustavo.kinrys@gmail.com"

**To:**  zcarvalho@bostonclinresearch.org

**Subject:**  gustavo.kinrys@gmail.com has shared a calendar with you.

81.    The body of the email reads:

Hello zcarvalho@bostonclinresearch.org,

We are writing to let you know that gustavo.kinrys@gmail.com has given you access to edit events on the Google Calendar called "gustavo.kinrys@gmail.com".

We have automatically added this calendar to your Google Calendar account. You can hide or completely remove this calendar at any time.

- The Google Calendar Team.

82.    The search warrant return shows only a single email, dated October 16, 2015, between the TARGET ACCOUNT and AZ's email account.  As with the emails between the TARGET ACCOUNT and ZC, in this email the calendar associated with the TARGET ACCOUNT is shared with AZ, enabling her to edit or add events to the calendar.

83.    As noted above, ZC began working at BCCR in 2013 and AZ began working there in 2015.

**The Creation and Use of Separate Google Calendars To Track Appointments for Two NeuroStar TMS Therapy Systems and for Psychotherapy Treatments**

84.    AZ, who worked at BCCR from 2015 until April 2018, indicated that, while she worked at BCCR, all of Dr. Kinrys's appointments, including both psychotherapy and TMS treatment, were maintained on a single Google calendar.  She stated that this calendar accurately

reflected the appointments that were actually scheduled—but did not necessarily reflect if an individual was a no-show or if someone received treatment as a walk-in.

85.  From the time that BCCR acquired a second NeuroStar TMS Therapy System in early 2018 until AZ quit in April 2018, appointments for the two machines were separately designated in the single shared calendar with the notations TMS1 or TMS2.

86.  According to ZC, ZC had a conversation with KINRYS and told KINRYS that the Google calendar BCCR was keeping was confusing and messy because, among other things, it included appointments for TMS patients in different colors.  ZC stated that, at some point after KINRYS purchased a second NeuroStar TMS Therapy System in early 2018, KINRYS created a separate Google calendar for the second NeuroStar TMS Therapy System.  Google produced subscriber information for the email address tms2@bostonclinresearch.org.  According to Google's response, the name of the subscriber for that email account is "TMS2 Calendar" and among the services that account has is Google Calendar.  Google produced similar information for the email address tms1@bostonclinresearch.org.  According to Google's response, the name of the subscriber for that email account is "TMS1 Calendar" and among the services that account has is Google Calendar.

87.  As described above in connection with Patient PM, there has been at least one instance where appointments listed in the Google calendar do not match the dates listed in the NeuroStar TMS Therapy Reports that ZC and AZ created at KINRYS's direction (which KINRYS produced in response to an HHS-OIG subpoena).  Also, there are appointments for Patient PM listed in the Google calendar that do not match the dates of service listed in the Medicare systems data for Patient PM.  Specifically, the Google calendar sent to Patient PM's

28

wife shows that Patient PM had 23 therapy appointments scheduled at BCCR between September 7, 2016 and January 4, 2018.  According to Medicare systems data, KINRYS billed Medicare for 42 psychotherapy sessions during that same period.

**Returns from Prior Search Warrants Show Calendar Appointments Only for TMS Treatment After May 15, 2018**

88.    A search warrant was previously obtained and executed for information pertaining to the Google-based accounts gkinrys@bostonclinresearch.org (Dr. Kinrys's work email address), tms1@bostonclinresearch.org, and tms2@bostonclinresearch.org.  *See In the Matter of the Search of Email Account gkinrys@bostonclinresearch.com*, No. 19-MJ-4064-DHH, (D. Mass. Feb. 28, 2019); *In the Matter of the Search of Email Account tms1@bostonclinresearch.org,* No. 19-MJ-4066-DHH, (D. Mass. Feb. 28, 2019); *In the Matter of the Search of Email Account tms2@bostonclinresearch.org*, No. 19-MJ-4067-DHH, (D. Mass. Feb. 28, 2019).  The returns from those search warrants included copies of Google calendars associated with each of these accounts.

89.    The Google calendar associated with gkinrys@bostonclinresearch.org does not show any patient appointments for either psychotherapy or TMS treatment.

90.    The tms1@bostonclinresearch.org and tms2@bostonclinresearch.org calendars list patient appointments for TMS therapy beginning on May 15, 2018 and going forward, but they do not show any patient appointments for psychotherapy treatment nor do those calendars show any TMS appointments prior to May 15, 2018.

**IP Address and Login Information Ties the TARGET ACCOUNT to the Creation of the TMS1 and TMS2 Calendars**

91.    Records obtained from Google show that the tms1@bostonclinresearch.org and

tms2@bostonclinresearch.org Google accounts were created at 11.11pm and 11.12pm,

respectively on May 14, 2018 (the day before the first appointments appear in that calendar).

The subscriber names associated with these accounts are TMS1 Calendar and TMS2 Calendar

respectively.

     92.   Records from Google also show multiple logins and logouts from the TARGET

ACCOUNT, gkinrys@bostonclinresearch.org, tms1@bostonclinresearch.org and

tms2@bostonclinresearch.org all occurring between 11.04pm on May 14, 2018 and 1.36am on

May 15, 2018—roughly contemporaneously with the creation of the TMS1 and TMS2 accounts.

     93.   These logins and logouts all occurred at the same IP address that is associated with

KINRYS's physical residential address, 2 Fuller Brook Rd, Wellesley, MA 02482.

     94.   The specific login and logout times are reflected below:

**gkinrys@bostonclinresearch.org**

| DATE | TIME | IP ADDRESS | Login / Logout |
|------|------|------------|----------------|
| 2018/05/14 | 23:04:54 | 73.4.35.79 | Login |
| 2018/05/15 | 01:14:18 | 73.4.35.79 | Login |
| 2018/05/15 | 01:18:26 | 73.4.35.79 | Login |
| 2018/05/15 | 01:19:54 | 73.4.35.79 | Logout |
| 2018/05/15 | 01:35:57 | 73.4.35.79 | Login |

**gustavo.kinrys@gmail.com**

| DATE | TIME | IP ADDRESS | Login / Logout |
|------|------|------------|----------------|
| 2018/05/15 | 01:16:26 | 73.4.35.79 | Logout |
| 2018/05/15 | 01:36:09 | 73.4.35.79 | Login |

**tms1@bostonclinresearch.org**

| DATE | TIME | IP ADDRESS | Login / Logout |
|------|------|------------|----------------|
| 2018/05/15 | 01:21:00 | 73.4.35.79 | Login |
| 2018/05/15 | 01:26.44 | 73.4.35.79 | Logout |

**tms2@bostonclinresearch.org**

| DATE | TIME | IP ADDRESS | Login / Logout |
|------|------|------------|----------------|
| 2018/05/15 | 01:28:07 | 73.4.35.79 | Login |
| 2018/05/15 | 01:35:48 | 73.4.35.79 | Logout |

95.    Records from Google show that each of these four accounts is linked to the other through machine cookies, indicating that the same web browser was used to access all four accounts.

96.    The subscriber name associated with both the TARGET ACCOUNT and gkinrys@bostonclinresearch.org is Gustavo Kinrys.

**Probable Cause to Believe that the Calendar Associated with the TARGET ACCOUNT Contains Evidence of the Crimes Described Above**

97.    I submit that, based upon the above information, there is probable cause to believe that the Google calendar associated with the TARGET ACCOUNT contains information concerning BCCR patient appointments for TMS treatment prior to May 15, 2018 and for psychotherapy treatment.  I further submit that there is probable cause to believe that the Google calendar associated with the TARGET ACCOUNT will show inconsistencies between the treatment that KINRYS and BCCR actually provided and the treatments for which KINRYS and BCCR billed.

98.    Specifically, on January 30, 2013, a Google-calendar associated with the TARGET ACCOUNT was shared with ZC, allowing her to edit and add appointments to that calendar.

The same calendar was shared with AZ on October 16, 2015.

99.    Prior to May 15, 2018 (when KINRYS created separate calendars to track TMS appointments), BCCR employees used a shared Google-calendar to track and record appointments for both TMS treatment and psychotherapy.  AZ used this single shared calendar to track and record both TMS and psychotherapy appointments for KINRYS until she left BCCR in April 2018.  ZC did so until separate calendars were created to track and record TMS appointments.

100.   On or around May 14 or May 15, 2018, KINRYS created two separate Google-based accounts to track appointments for patients undergoing TMS treatment—the TMS1 and TMS2 Calendar accounts.  Contemporaneously with the creation of these accounts, there were multiple logins to KINRYS's BCCR email account (gkinrys@bostonclinresearch.org), the TARGET ACCOUNT, and the TMS1 and TMS2 calendar accounts occurring from the same IP address associated with KINRYS's residence, 2 Fuller Brook Rd, Wellesley, MA 02482.

101.    The search warrant returns obtained to date show that the shared Google-calendar used to track BCCR psychotherapy and TMS treatment appointments prior to May 15, 2018 is not associated with KINRYS's BCCR email account, providing a basis to believe that the calendar used to track TMS and psychotherapy appointments prior to May 15, 2018 is instead the calendar associated with the TARGET ACCOUNT that had been shared with ZC and AZ in 2013 and 2015 respectively.

102.   On January 9, 2019, the U.S. Attorney's Office for the District of Massachusetts submitted a letter to Google requesting that the company preserve records associated with

gustavo.kinrys@gmail.com for 90 days under 18 U.S.C. § 2703(f).[2]

**ZC's Access of Her @bostonclinresearch.org account After Leaving BCCR in October 2018**

103.   I interviewed ZC on the following dates between September 2018 and January 2019:  September 7, 2018, October 4, 2018, October 5, 2018, October 9, 2018, October 12, 2018 and January 25, 2019.  During several of these interviews, ZC had her personal laptop computer open on a table in front of her.  During several of these interviews, ZC (a) showed investigators several screenshots of her computer showing emails she exchanged with KINRYS in the past, (b) provided several emails between her and KINRYS from the time when she worked at BCCR, and (c) read aloud portions of several emails she and KINRYS had exchanged during the time ZC worked at BCCR.  I assumed that, despite not working at BCCR any longer, ZC was in possession of old emails between ZC and KINRYS.  At the outset of my October 12, 2018 interview with ZC, out of an abundance of caution, I told ZC that I was not asking her to access her BCCR email account (@bostonclinresearch.org) and that she should not access her BCCR email account.  One reason I provided ZC with this direction was that BCCR has been represented by counsel since at least June 2018 in connection with HHS-OIG's investigation into KINRYS and BCCR's billing practices.  It was during this October 12, 2018 interview that ZC made me aware, for the first time, that she still had access to her @bostonclinresearch.org email account despite the fact that she no longer worked at BCCR.  I made clear at this time that ZC

_____

[2] On October 9, 2018, the U.S. Attorney's Office for the District of Massachusetts had submitted a prior letter to Google requesting that the company preserve records associated with gustavo.kinrys@gmail.*org*, along with other accounts, for 90 days under 18 U.S.C. § 2703(f).

33

should not access the BCCR email system even if she was able to access to it.  I never directed or asked ZC to access the BCCR email system either before or after this point in time.

104.   The government is not relying on any of the emails ZC read, showed, or forwarded to investigators during the interviews with her on September 7, 2018, October 4, 2018, October 5, 2018 or October 12, 2018 to establish probable cause necessary to search and seize the TARGET ACCOUNT.

## TECHNICAL BACKGROUND

105.   In my training and experience, enterprises today increasingly use cloud service providers to manage email for employees (or students, contractors, and any other individuals associated with the enterprise), as well as for other types of information. Under this arrangement, the enterprise pays the cloud service provider to host its email accounts and data.  Although the enterprise's email addresses still bear the enterprise's domain name (that is, for example, they end in "@company.com"), the service provider stores its content and helps manage access and security for the domain.

106.   As described above, through this investigation, I learned that TARGET ACCOUNT is hosted by Google.

107.   In my training and experience, I have learned that email hosting companies, such as Google, maintain computer servers connected to the Internet.  Through those computer servers, customers send and receive email on the Internet.  Customers typically access their accounts on the company's email servers from any computer connected to the internet.

108.   When an email user sends an email, it is initiated at the user's computer, transferred via the Internet to the computer servers of the user's email provider, and then transmitted to its

end destination.  Conversely, an email sent to an email recipient is transmitted to the computer

servers of the recipient's email provider where it can be accessed by the recipient and transferred

to the recipient's computer to be read.

109.   In my training and experience, I have learned that email service providers typically

allow customers to store incoming and outgoing emails on the email service provider's computer

servers.  These emails can be stored on the email service provider's computer servers until the

customer elects to remove or delete the emails from the service provider's computer servers, until

the customer's mailbox reaches storage limitations set by the email service provider, or until

other terms set by the email service provider are met.  In the case of emails that are removed or

deleted from the email service provider's computer servers by a customer, email service

providers may retain those emails for a period of time, known as a deleted item retention period.

110.   The TARGET ACCOUNT has a variety of services and tools associated with it,

including web-based calendars.  Google provides dozens of such services to Google account

users for personal and/or business convenience.

111.   E-mail providers also typically maintain electronic records relating to their

customers.  These records include account application information, account access information,

and e-mail transaction information.

## LEGAL AUTHORITY

112.   The government may obtain both electronic communications and subscriber

information from an e-mail provider by obtaining a search warrant.  18 U.S.C. §§ 2703(a),

2703(c)(1)(A).

113.   Any court with jurisdiction over the offense under investigation may issue a search

warrant under 18 U.S.C. § 2703(a), regardless of the location of the website hosting company or e-mail provider whose information will be searched.  18 U.S.C. § 2703(b)(1)(A).  Furthermore, unlike other search warrants, § 2703 warrants do not require an officer to be present for service or execution of the search warrant.  18 U.S.C. § 2703(g).

114.  If the government obtains a search warrant, there is no requirement that either the government or the provider give notice to the subscriber.  18 U.S.C. §§ 2703(b)(1)(A), 2703(c)(3).

115.  This application seek a warrant to search all responsive records and information under the control of Google (as described in the Attachment B), a provider subject to the jurisdiction of this court, regardless of where Google has chosen to store such information. Pursuant to 18 U.S.C. § 2713, the government intends to require the disclosure pursuant to the warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Google's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

**<u>REQUEST TO SEAL AND PRECLUDE NOTICE TO THE SUBSCRIBERS</u>**

116.  I request that this application, the warrant, the order, and any related papers be sealed by the Court until such time as the Court pursuant to Local Rule 7.2 directs otherwise.

117.  I further request that, pursuant to the preclusion-of-notice provisions of 18 U.S.C. § 2705(b), the Court order Google not to notify any person (including the subscriber to whom the materials relate) of the existence of this application or the Court's Order for the earlier of one

year from the date of the Court's Order or upon notice by the government within 30 days of the

conclusion of its investigation, unless the Court extends such period under 18 U.S.C. § 2705(b).

Non-disclosure is appropriate in this case because the Court's Order relates to an ongoing

criminal investigation that is neither public nor known to all of the targets of the investigation,

and its disclosure may alert the targets to the existence of investigation.  There is accordingly

reason to believe that notification of the existence of the Order will seriously jeopardize the

investigation, including by giving targets an opportunity to flee prosecution, destroy or tamper

with evidence, change patterns of behavior or intimidate potential witnesses.  See 18 U.S.C.

§ 2705(b).  Moreover, some of the evidence in this investigation is stored electronically.  If

alerted to the existence of the Order, the targets could destroy that evidence, including

information saved to their personal computing devices, on other electronic media, or in social

media accounts.

## FOURTEEN-DAY RULE FOR EXECUTION OF WARRANT

118.  Federal Rule of Criminal Procedure 41(e)(2)(A)(B) directs the United States to

execute a search warrant for electronic evidence within 14 days of the warrant's issuance.  If the

Court issues these warrant, the United States will execute it not by entering the premises and

Google, as with a conventional warrant, but rather by serving a copy of the warrant on the

company and awaiting the production of the requested data.  This practice is approved in 18

U.S.C. § 2703(g), and it is generally a prudent one because it minimizes the government's

intrusion onto Internet companies' physical premises and the resulting disruption of their

business practices.

119.  Based on my training and experience and that of other law enforcement, I

understand that e-mail providers sometimes produce data in response to a search warrant outside the 14-day period set forth in Rule 41 for execution of a warrant.  I also understand that e-mail providers sometimes produce data that was created or received after this 14-day deadline ("late-created data").

120.   The United States does not ask for this extra data or participate in its production.

121.   Should Google produce late-created data in response to the warrant, I request permission to view all late-created data that was created by Google, including subscriber, IP address, logging, and other transactional data, without further order of the Court.  This information could also be obtained by grand jury subpoena or an order under 18 U.S.C. § 2703(d), neither of which contains a 14-day time limit.  However, law enforcement personnel will seek to avoid reviewing any late-created data that was created by or received by the account-holder(s), such as e-mail, absent a follow-up warrant.

122.   For these reasons, I request that the Court approve the procedures in the Attachment B, which set forth these limitations.

## **CONCLUSION**

123.  Based on the information described above, I have probable cause to believe that records and data from the TARGET ACCOUNT, specifically the electronic calendar associated with that account, contains evidence, fruits, and instrumentalities of the above-listed crimes (as described in the Attachment B).

124.  The procedures for copying and reviewing the relevant records are set out in Attachment B.

Respectfully ~~submitted~~,

ERIN FULLER
Special Agent
United States Department of Health and
Human Services, Office of Inspector
General

Subscribed and sworn to before me
on __**May 15, 2019**_____
          Date

DAVID H. HENNESSY
Chief United States Magistrate Judge

39